UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
DARRELL GIST,

                      Plaintiff,

v.

DR. DIANE SOMMER; OFFICER GEORGE
HUNTER; OFFICER RICHARD MCGRATH;
THE ESTATE OF OFFICER RICHARD
O'MALLEY; LIEUTENANT CARL
PEARSON; CAPTAIN MATTHEW
WHINNERY; ASSISTANT HEALTH
SERVICES ADMINISTRATOR BRYAN
WALLS; and WARDEN MONICA
RECKTENWALD,

                      Defendants.
--------------------------------------------------------------x

**OPINION AND ORDER**

14 CV 6736 (VB)

Briccetti, J.:

       Plaintiff Darrell Gist brings a Bivens claim under the Eighth Amendment for deliberate indifference to his serious medical needs against Dr. Diane Sommer, Officer George Hunter, Officer Richard McGrath, the Estate of Officer Richard O'Malley, Lieutenant ("Lt.") Carl Pearson, Captain ("Capt.") Matthew Whinnery, Assistant Health Services Administrator ("AHSA") Bryan Walls, and Warden Monica Recktenwald.

       Before the Court is defendants' motion for summary judgment. (Doc. #238).

       For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART.

       The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

       The parties have submitted briefs, declarations with exhibits, and statements of material fact pursuant to Local Civil Rule 56.1, which together reflect the following factual background.

I.  May 2012 to April 2014

The events relevant to this action occurred while plaintiff, an inmate in the custody of the United States Bureau of Prisons ("BOP"), was incarcerated at Federal Correctional Institution ("FCI") Otisville, in Otisville, New York.

Plaintiff arrived at Otisville on May 31, 2012. That same day, he received an initial health screening. Approximately two weeks later, on June 12, 2012, plaintiff was seen by Otisville's clinical director, Dr. Diane Sommer.

The parties agree that on June 12, 2012, plaintiff told Dr. Sommer he experienced pain and swelling in his limbs, and she ordered blood tests and further follow-up testing. However, plaintiff claims he also told Dr. Sommer his pain was extreme, he needed an MRI, and that he had a prior X-ray which indicated a degenerative disc disease in his neck and back. No MRI of his back was performed.

From June 2012 to December 2013, plaintiff complained repeatedly to medical staff at Otisville about his physical health. During this time, Dr. Sommer made efforts to diagnose plaintiff's illness, including referring plaintiff to an outside rheumatologist in April 2013, and sending plaintiff for a brain MRI in July 2013. However, plaintiff insists Dr. Sommer could have been more responsive to plaintiff's complaints.[1] For example, Dr. Sommer could have determined earlier the cause of plaintiff's pain had she sent him to an outside neurologist, a view supported by plaintiff's retained expert, Dr. Richard Lechtenberg. Indeed, Dr. Lechtenberg identified injuries to the C3 and C4 intervertebral discs visible in images taken on July 22, 2013.

---

[1]  Dr. Sommer had misdiagnosed plaintiff's illness as polymyositis and prescribed medicine comporting with the diagnosis. The parties dispute whether the medication actually improved plaintiff's condition, and whether Dr. Sommer believed it was improving his condition.

Further, plaintiff testified the rheumatologist advised plaintiff he should receive a neurological consultation. However, Dr. Sommer did not refer plaintiff to a neurologist at that time.

In September 2013, plaintiff told a physician's assistant he was having trouble walking. Plaintiff made a similar complaint in March 2014 to Dr. Sommer.

Dr. Sommer said she saw plaintiff on March 6, 21, and 28, 2014. On March 27, 2014, Dr. Sommer referred plaintiff to an outside neurology consultation for a nerve conduction study. Dr. Sommer reviewed the results, which "noted that the study was abnormal" and included evidence of carpal tunnel syndrome and pinched nerves, including in the intervertebral discs, the "right C5, left C5, left C6 and left C7 radiculopathies." (Doc. #244 ("Sommer Decl.") ¶ 20). Dr. Sommer hypothesized plaintiff might have a different autoimmune disease; however, this too was a misdiagnosis.

Plaintiff's sister called the BOP on April 9, 2014, to discuss plaintiff's deteriorating condition. Melissa Fisher, a health systems specialist, spoke with plaintiff's sister and informed AHSA Walls about the call: "I received a call from this inmate's sister today. She said she spoke with him earlier today and he is in excruciating pain. He is unable to push his wheelchair . . . because of pain in his hands." (Doc. #259 ("Rosen Decl.") Ex. A at US_7281). AHSA Walls responded, suggesting plaintiff's sister was "bugging" BOP. (Id. at US_7281, US_7287).

AHSA Walls forwarded his correspondence with Fisher to Dr. Sommer on April 10, 2014. That day, Dr. Sommer, AHSA Walls, and Warden Recktenwald were contacted by a BOP case manager regarding plaintiff's condition. Dr. Sommer responded by saying plaintiff has been "exaggerating his symptoms over the past week" and avoiding her. (Rosen Decl. Ex. A at US_7286). AHSA Walls made a similar comment, writing "it seems he is playing the sympathy card." (Id. at US_7289). Nevertheless, the record indicates that on April 10, 2014, Dr. Sommer

3

recommended lab work for myasthenia gravis, which required an "MRI of neck and spine." (Rosen Decl. Ex. A at US_1400). However, no such lab work or MRI occurred while plaintiff was at Otisville.

Also on April 10, 2014, Dr. Sommer initiated the process to transfer plaintiff to a Federal Medical Center ("FMC") by completing a transfer form. (Rosen Decl. Ex. A at US_7289) (Dr. Sommer writes, "770 typed and to be routed."). The parties dispute Dr. Sommer's motivations for doing so. Dr. Sommer claims she initiated plaintiff's transfer because his condition was severe and interfering with daily living, whereas plaintiff argues Dr. Sommer did not want to deal with plaintiff's medical complaints. Plaintiff testified Dr. Sommer viewed plaintiff as malingering and suggests her position on the Utilization Review Committee (the "URC")—a committee which decides whether to authorize certain medical treatment for inmates—affected her decision to transfer plaintiff to another facility.

II. <u>Incident of April 11, 2014</u>

In the early morning of April 11, 2014, plaintiff was in his cell at Otisville. Plaintiff testified he fell, hit his head on his locker, and called for help. Plaintiff estimates he remained on the floor for an hour. Eventually, Officer Hunter checked plaintiff's cell and found him on the ground. Plaintiff told Officer Hunter he was hurt and could not move his legs.

Officer Hunter called Lt. Pearson to advise on next steps. Lt. Pearson sent Officers O'Malley and McGrath to assist. According to the officers, plaintiff was not bleeding, lacked visible injury, and did not report significant pain. Lt. Pearson did not consult the on-call physician or call 911.

The officers moved plaintiff back to his bed. The parties dispute whether the officers returned plaintiff to the bed in a manner which exacerbated his medical condition. The officers

4

argue they helped plaintiff to the bed and that his body made contact with the mattress and pillow, whereas plaintiff testified the officers grabbed his arms and legs and "swung [him] on[to] the bed." (Rosen Decl. Ex. C ("Pl. Dep.") at 174). Consequently, plaintiff claims he had spasms in his lower back, urinated on himself, and could not move.

At 7:30 a.m. that morning, AHSA Walls reported to work and was informed about plaintiff's fall. Plaintiff was then brought to health services on a back board with a cervical collar. At health services, plaintiff was seen by Nurse Brooks. Dr. Sommer—who did not examine plaintiff—ordered CT scans of plaintiff's "head, neck and lumbar spine" to rule out bleeding in plaintiff's brain. (Rosen Decl. Ex. A at US_1407).

A CT scan was taken of plaintiff's head, neck, and lumbar spine. Plaintiff was then escorted by AHSA Walls to a holding cell in health services. According to plaintiff, AHSA Walls accused plaintiff of pulling a "stunt" respecting his medical care. (Pl. Dep. at 193). After the CT scan was complete, Dr. Sommer reviewed the images but did not identify fractures or other findings indicating a medical emergency. However, plaintiff claims he overheard Dr. Sommer call him malingering while speaking with AHSA Walls. Thereafter, plaintiff's cervical collar was removed, and he was taken off the backboard.

Dr. Sommer also sent the CT scan imaging to an outside radiologist. On April 14, 2014, Dr. Sommer reviewed the consulting radiologist's report. In the report, the radiologist noted the impingement of a disc at the C3-C4 level on the spinal cord, as well as degenerative changes and narrowing ("stenosis") of the space in the spine. (See Rosen Decl. Ex. A at US_1225). Dr. Sommer viewed these results as indicating chronic issues. Specifically, Dr. Sommer wrote, "ct scan of the neck – diffuse degenerative changes," "[m]oderate size disc protrusion at c3/c4 impinging the spinal cord," "normal ct of the brain," and "moderate disc protrusion at L4/L5 . . .

5

diffuse degenerative changes." (Id. at US_1414). According to plaintiff's expert, the report clearly notes spinal cord impingement. (See Rosen Decl. Ex. B ("Lechtenberg Report") at 5–6).

III.  Special Housing Unit Placement

Following plaintiff's April 11 fall, Capt. Whinnery—after consultation with AHSA Walls and Dr. Sommer—decided to place plaintiff in the Special Housing Unit (the "SHU").[2] Plaintiff remained in the SHU from April 11, 2014, to May 7, 2014.

Defendants assert they placed plaintiff in the SHU for plaintiff's medical safety because there, plaintiff would be brought food and medication directly, there was a higher ratio of staff to inmates, and plaintiff could be escorted to the shower. When Warden Recktenwald was later informed plaintiff had been placed in the SHU, she offered further support for the decision.

However, plaintiff insists defendants placed him in the SHU because they saw him as difficult.[3] Indeed, plaintiff said that during his first three days in the SHU, he could not reach the opening in his cell door to obtain food, water, or medication. Plaintiff also testified defendants refused to enter his cell because they viewed plaintiff's complaints as exaggerated. (See Rosen Decl. Ex. A at US_1293) ("Pt made no obvious effort to get out of bed. Unable to gain entry into cell.").

Plaintiff testified that on April 16, 2014, he told Warden Recktenwald during her weekly round in the SHU he was not receiving proper medical attention. Recktenwald told plaintiff she

---

[2]  A nurse wrote that plaintiff planned to request to be placed in the SHU for safety, but plaintiff contests this claim, and no such formal request was ever made. (See Pl. Dep. at 134). Moreover, plaintiff insists he was not given an opportunity to attend a hearing to challenge his placement in the SHU, despite federal regulations. (Doc. #261 ("Pl. Decl.") ¶ 64) (citing 28 C.F.R. § 541.26(b)).

[3]  Plaintiff testified Capt. Whinnery and AHSA Walls had issued an order to all medical staff working the SHU not to enter plaintiff's cell for any reason.

would look into it, but there is no evidence she ever did. Warden Recktenwald did not visit plaintiff again during his time in the SHU.

Defendants contend plaintiff was seen by Otisville medical staff nearly every day while he was confined to the SHU, but plaintiff asserts the SHU record contradicts this claim.

IV. Transfer to FMC Butner

As noted above, on April 10, 2014, Dr. Sommer filed a transfer request form to have plaintiff moved to another facility.

To effectuate the transfer, Dr. Sommer completed a form and sent it to Warden Recktenwald for approval on April 11, 2014. The transfer request was marked as "routine-urgent" and Dr. Sommer requested the transfer be done by air charter. Warden Recktenwald approved the transfer request form. She also instructed those preparing plaintiff's transfer form to "indicate that due to his muscle weakness, he is dropping things, not able to ambulate long distances and falling frequently. He has been placed in our SHU due to his inability to come to pill line," and other needs for assistance. (Rosen Decl. Ex. A at US_7325). She added, "I don't know if he's requiring much assistance in SHU, but if we've made exceptions . . . then we can expand on that as well." (Id.).

Plaintiff was scheduled to be transferred to FCI Butner, in Butner, North Carolina, on April 28, 2014. After defendants were informed of plaintiff's impending transfer, Dr. Sommer and Capt. Whinnery sent emails indicating plaintiff's departure from Otisville was a positive development. For example, Whinnery wrote, "Happy Days [. . .] Gist leaves tomorrow," and Dr. Sommer wrote, "What! No dancing." (Rosen Decl. Ex. A at US_7348, US_7359).

On May 7, 2014, plaintiff was transferred from Otisville to FCI Butner. Plaintiff was then taken to FMC Butner—a medical facility—following demonstrated signs of inability to walk and complaints of extreme pain.

Notably, the URC did not address or authorize plaintiff's MRI or outside rheumatology consult prior to plaintiff's transfer. Indeed, the URC did not even consider Dr. Sommers's MRI recommendation until May 21, 2014, thirteen days after plaintiff was transferred out of Otisville. Further, plaintiff testified AHSA Walls told him on April 30, 2014, "the medical procedure that [plaintiff] needed was too expensive and would affect Otisville's insurance, and that this was why [defendants] were transferring [him]." (Pl. Decl. ¶ 64). Plaintiff never had an MRI of his spine taken while he was incarcerated at Otisville.

In June 2014, at FMC Butner, plaintiff was treated by a physical therapist who recognized his symptoms and sent him for a cervical myelopathy consultation with a neurosurgeon. The neurosurgeon ordered an MRI on June 6, 2014, which showed "Large disc herniation at C3-4, compressing the cervical spinal cord at this level with moderate to severe spinal canal stenosis." (Rosen Decl. Ex. A at US_1600).

Plaintiff saw an outside neurosurgeon on June 24, 2014. The neurosurgeon confirmed the cervical myelopathy diagnosis, a condition of the spinal cord and neck. Plaintiff was admitted for surgery immediately thereafter at Duke University Hospital.

V.   Conduct Exacerbating Injury

Despite surgery, plaintiff remains unable to walk and is confined to a wheelchair. Plaintiff's expert Dr. Lechtenberg claims that had plaintiff received adequate medical treatment in 2013, he would be able to walk today. Plaintiff asserts the evidence demonstrates Dr. Sommer's conduct exacerbated his medical condition, specifically: her failure to order an MRI

8

of plaintiff's neck and cervical spine; her improper treatment following plaintiff's July 2013 MRI; her refusal to send plaintiff to an outside neurologist for diagnosis; and her failure to address reports of plaintiff's C3-C4 spinal disc impingement.

Plaintiff also argues the record demonstrates Dr. Sommer, AHSA Walls, Warden Recktenwald, and Capt. Whinnery locked plaintiff in the SHU for one month, and in doing so, knowingly limited plaintiff's access to necessary medical treatment. Indeed, even defendants' expert Dr. Daveed Frazier agreed "a hypothetical 27-day delay from the time of a reported trauma to an initial medical examination could lead to deterioration of a hypothetical patient's neurologic status and impact his/her ultimate outcome." (Rosen Decl. Ex. D at 8). Moreover, Dr. Frazier identified X-rays and MRI images dating back to June 2012, from which he could identify degenerative discs in plaintiff's spinal cord.

Respecting the other individual defendants, plaintiff argues the record evidence demonstrates Officers Hunter, McGrath, and O'Malley further injured plaintiff after he fell on April 11, 2014, and that Lt. Pearson did not obtain necessary medical care.

## DISCUSSION

I. <u>Legal Standard</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).[4]

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

9

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which

summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. Inadequate Medical Care Claim

Defendants argue the undisputed facts show as a matter of law that plaintiff cannot establish a deliberate indifference to medical needs claim against any defendant.

The Court disagrees.

A. Legal Standard

A claim for deliberate indifference brought by a convicted prisoner is analyzed under the Eighth Amendment. See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). To succeed on a claim for constitutionally inadequate medical care under the Eighth Amendment's ban on cruel and unusual punishment, a prisoner must make a sufficient showing of "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). This test has both an objective and a subjective component: plaintiff must establish (i) the alleged deprivation of adequate medical care is "sufficiently serious," and (ii) the officials in question acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006).[5]

---

[5] Because this is a Bivens action, a plaintiff must demonstrate "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Id. However, "supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

In the context of medical care, two inquiries determine whether a deprivation is objectively serious. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." Salahuddin v. Goord, 467 F.3d at 279. Because "the prison official's duty is only to provide reasonable care," prison officials are liable only if they fail "'to take reasonable measures' in response to a medical condition." Id. at 279–80 (quoting Farmer v. Brennan, 511 U.S. 825, 847 (1994)).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious" by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Salahuddin v. Goord, 467 F.3d at 280. In determining whether an alleged injury is a "serious" medical condition, "[f]actors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin v. Goord, 467 F.3d at 280. If the offending conduct is the "medical treatment given," however, "the seriousness inquiry is narrower." Id. When "the prisoner is receiving appropriate on-going treatment for his condition," and brings a "denial of medical care claim based on a temporary delay or interruption in treatment," courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the severity of the prisoner's underlying medical condition." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).

The mens rea component requires a showing that defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm. Salahuddin v. Goord, 467 F.3d at 280. "[T]he charged official must act with a sufficiently culpable state of mind." Id. "To satisfy this prong of the deliberate indifference test, a plaintiff must allege only that the defendant was 'aware of facts' from which one could infer that 'a substantial risk of serious harm' existed, and that the defendant actually drew that inference." Dotson v. Fischer, 613 F. App'x 35, 38–39 (2d Cir. 2015) (summary order) (citing Farmer v. Brennan, 511 U.S. at 837).

In cases challenging the adequacy of the medical treatment given, "the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Salahuddin v. Goord, 467 F.3d at 280 (quoting Smith v. Carpenter, 316 F.3d at 185). "'[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes.'" Smith v. Carpenter, 316 F.3d at 186.

Moreover, "negligence, even if it constitutes medical malpractice, does not, without more," give rise to a constitutional claim. Chance v. Armstrong, 143 F.3d at 703. Further, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Id.

13

However, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." Chance v. Armstrong, 143 F.3d at 703 (citing Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)). For example, if the defendants recommended a medical treatment "not on the basis of their medical views, but because of monetary incentives," or if there are "allegation[s] of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment," such conduct is sufficient to demonstrate a deliberate indifference claim. Id. at 704. And if a plaintiff presents evidence showing the substantial risk of harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the defendant-official being sued had been exposed to information concerning the risk . . . then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Farmer v. Brennan, 511 U.S. at 842–43.

B.  Application

Here, plaintiff's medical needs are sufficiently serious to satisfy the first prong of the deliberate indifference analysis.

Plaintiff and the individual defendants agree plaintiff complained of pain for nearly two years while confined at Otisville. See Farmer v. Brennan, 511 U.S. at 842–43. In addition, the record evidence supports a finding that the delay in treatment might have exacerbated plaintiff's injuries. Salahuddin v. Goord, 467 F.3d at 280. Indeed, plaintiff's spinal cord impingement—once diagnosed—required immediate surgical intervention. And despite surgery, plaintiff remains confined to a wheelchair and continues to experience significant pain. Accordingly, the first prong of the deliberate indifference analysis is satisfied.

As to the second prong of the deliberate indifference analysis, the Court analyzes the individual defendants and their respective mental states to determine whether there are evidentiary facts that give rise to the inference that the individual defendants had a conscious disregard for plaintiff's serious medical needs.

      i.      Dr. Sommer

There is a genuine dispute of material fact with respect to whether Dr. Sommer consciously disregarded plaintiff's serious medical needs and disregarded a serious risk of harm to plaintiff, which precludes summary judgment.

First, the record evidence demonstrates plaintiff repeatedly asked Dr. Sommer for, yet was never given, an MRI of his spine which a reasonable juror could conclude would have diagnosed his condition, and possibly avoided plaintiff's ultimate confinement to a wheelchair and inability to walk. Nevertheless, had Dr. Sommer closely examined plaintiff's X-rays taken in 2012 or brain MRI taken July 2013, she might have diagnosed plaintiff's spinal cord impingement. The record thus gives rise to a fair inference that Dr. Sommer overlooked such indications.

Second, despite suggesting she would authorize a neurology consultation, Dr. Sommer sent plaintiff for a nerve conduction test only. Indeed, as Chair of the URC, Dr. Sommer was in a position to—and yet did not—authorize an MRI of plaintiff's lumbar and cervical spine or an outside neurology consultation, despite the recommendation of the rheumatologist that plaintiff receive an MRI of the brain and spinal cord. Further, plaintiff testified Dr. Sommer's failure to do so was because of cost concerns. See Chance v. Armstrong, 143 F.3d at 703–04.

Third, a reasonable juror could find Dr. Sommer caused an unreasonable delay in plaintiff's treatment by advocating for his placement in SHU following his April 11 fall, as

15

opposed to additional medical attention, given her knowledge or awareness of plaintiff's pre-existing medical condition. According to plaintiff, Dr. Sommer never came to his cell during the four weeks he was housed in the SHU. Indeed, even defendants' expert agreed Dr. Sommer's conduct might have exacerbated plaintiff's injury by relegating him to the SHU for one month following his fall.

Fourth, the record demonstrates Dr. Sommer may have had an unfavorable opinion of plaintiff, and thought he was exaggerating his symptoms.

Finally, Dr. Lechtenberg states Dr. Sommer's professional conduct "constituted an extreme deviation from the applicable standard of care." (Lechtenberg Report at 8).

Accordingly, Dr. Sommer is not entitled to summary judgment on plaintiff's deliberate indifference claim.

      ii.    AHSA Walls

There is also a genuine dispute of material fact regarding whether AHSA Walls consciously disregarded plaintiff's serious medical needs and a serious risk of harm.

AHSA Walls had knowledge of plaintiff's injury. Plaintiff filed grievances respecting his lack of treatment. Plaintiff's sister complained about plaintiff's medical condition and those complaints were referred to AHSA Walls. He participated in the discussion about whether to place plaintiff in the SHU for his own safety, and he sat on the URC, the committee that considered whether to authorize medical consults and procedures for inmates with medical needs.

The record evidence also shows that AHSA Walls considered plaintiff to be malingering, or at least, exaggerating his symptoms. Such evidence raises a material factual dispute concerning AHSA Walls's motive, specifically whether his decision not to provide plaintiff an

16

MRI and an outside neurology consultation in his capacity as a URC member was rooted in his disregard for plaintiff's medical needs.

Finally, there is record evidence AHSA Walls did not approve necessary medical treatment because of cost. According to plaintiff, when he asked AHSA Walls why he and Dr. Sommer were denying him medical treatment, "Walls responded that the medical procedure that I needed was too expensive and would affect Otisville's insurance, and that this was why they were transferring me." (Pl. Decl. ¶ 63). Such statement raises a factual dispute concerning AHSA Walls's mental state vis-à-vis plaintiff's medical treatment.

Accordingly, AHSA Walls is not entitled to summary judgment on plaintiff's deliberate indifference claim.

### iii. Warden Recktenwald

Although Warden Recktenwald's involvement in plaintiff's provision of medical care was more limited, the record shows she was aware of his complaints and yet did nothing to aid his treatment while he was incarcerated at FCI Otisville. Thus, she is not entitled to summary judgment. Specifically, Warden Recktenwald was aware of plaintiff's pain and his April 11 fall, she authorized plaintiff's medical transfer, and plaintiff testified he told Warden Recktenwald on April 16, 2014, about his extreme pain and lack of treatment, during her weekly rounds in the SHU. Although, according to plaintiff, Warden Recktenwald promised him she would follow up and return, she never did. Moreover, there is documentary evidence to suggest Warden Recktenwald viewed plaintiff as malingering, from which a reasonable juror could infer a culpable mental state.

Accordingly, Warden Recktenwald is not entitled to summary judgment on plaintiff's deliberate indifference claim.

iv. <u>Capt. Whinnery</u>

Capt. Whinnery's involvement in plaintiff's medical care was also limited, yet he too is not entitled to summary judgment. It is undisputed Capt. Whinnery authorized the decision to send plaintiff to the SHU following his fall on April 11. In doing so, Whinnery was aware of plaintiff's serious medical needs. Nevertheless, plaintiff testified that Capt. Whinnery ordered medical staff not to enter plaintiff's cell under any circumstances, thereby denying plaintiff access to medical treatment. Thus, any deprivation that occurred while plaintiff was confined in the SHU could be attributed to Whinnery, either directly or in a supervisory capacity. Moreover, there is documentary evidence that Capt. Whinnery also wanted plaintiff out of Otisville. A reasonable juror could therefore find Capt. Whinnery had an improper motive in denying or delaying plaintiff's access to medical care.

Accordingly, Capt. Whinnery is not entitled to summary judgment on plaintiff's deliberate indifference claim.

v. <u>Officers Hunter, McGrath, and O'Malley, and Lt. Pearson</u>

There is no evidence in the record that the individual defendants who attended to plaintiff following his April 11 fall—Officers Hunter, McGrath, and O'Malley, and Lt. Pearson—knew of plaintiff's serious medical needs; therefore, they are entitled to summary judgment. The parties agree plaintiff did not have visible injuries following his fall, <u>i.e.</u>, he was not bleeding, and although he complained of pain, the officers did not know how serious plaintiff's condition was. Officer Hunter, the first individual to see plaintiff following his fall, recalled seeing a wheelchair and cane in his cell, but that alone is insufficient to give rise to an inference that he was aware of plaintiff's serious medical needs.

Moreover, unlike the individual defendants discussed above, there is no evidence that either the officers or Lt. Pearson thought plaintiff was faking his injuries. The facts are merely that Officers Hunter, McGrath, and O'Malley moved plaintiff back to his mattress, at the direction of Lt. Pearson, and failed to call the overnight doctor, given the lack of visible injuries. Thus, no reasonable juror could infer Officers Hunter, McGrath, O'Malley, and Lt. Pearson had a culpable state of mind.

Accordingly, plaintiff's deliberate indifference claim against Officers Hunter, McGrath, and O'Malley, as well as Lt. Pearson, fails as a matter of law.

III. Qualified Immunity

Defendants argue that to the extent the record supports a claim for deliberate indifference to serious medical needs, such claim should be dismissed because defendants are entitled to qualified immunity.[6]

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Where a factual issue exists on the issue of motive or intent, a

---

[6] Because plaintiff's claims against Hunter, McGrath, O'Malley, and Pearson fail as a matter of law, the Court need not address whether they are entitled to qualified immunity.

19

defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003); see also Atkins v. County of Orange, 372 F. Supp. 2d 377, 403–04 (S.D.N.Y. 2005) (precluding summary judgment on defense of qualified immunity as to plaintiff's excessive force claim), aff'd sub nom. Bellotto v. County of Orange, 248 F. App'x 232 (2d Cir. 2007) (amended summary order).

Here, there is a genuine factual dispute concerning whether defendants Dr. Sommer, AHSA Walls, Warden Recktenwald, and Captain Whinnery had ulterior motives in managing plaintiff's medical care, and whether such motives adversely impacted the provision of medical care plaintiff received at Otisville.

Accordingly, these factual issues preclude summary judgment on grounds of qualified immunity.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Counsel are directed to appear for a status conference on April 1, 2020, at 3:00 p.m., at which time the Court will set a trial date and a schedule for pretrial submissions.

The Clerk is instructed to terminate the motion (Doc. #238), and terminate defendants Officer George Hunter, Officer Richard McGrath, the Estate of Officer Roger O'Malley, and Lieutenant Carl Pearson from the docket.

Dated: February 24, 2020
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge